PRUDENTIAL INSURANCE COMPANY OF AMERICA, PLAINTIFF, *v.* CARR, DEFENDANT.

Common Pleas Court, Marion County.

No. 36401.   Decided June 5, 1964.

*Messrs. Wright, Harlor, Morris, Arnold & Glander, Mr. Earl F. Morris,* of Counsel, for plaintiff.

*Messrs. Wiedemann & Wiedemann, Mr. Frank Wiedemann,* of Counsel, for defendant.

(SANDERS, J., of Union County, sitting by assignment in Marion County.)

SANDERS, J. The court finds:

On January 26, 1960, the defendant, Mr. Carr, went to the Frederick C. Smith Clinic as a result of low back pain following an industrial injury. He was seen by Dr. Vernon A. Nichols, an internist on the staff of the Clinic. He was given treatment and medication for the back condition and when he returned to the Clinic on February 2, 1960, his back had improved but on this occasion he complained of chest pains which he said he had had for several years. In view of this complaint Dr. Nichols on February 2, and February 8 did a complete physical examination, including a chest x-ray, electrocardiogram and blood tests. As a result of the examination Dr. Nichols found that Mr. Carr had a heart abnormality which was a variation of the Wolf-Parkinson-White syndrome and diagnosed the condition as angina secondary to pre-excitation syndrome; and leukocytosis or a high white cell blood count.

Dr. Nichols told both Mr. and Mrs. Carr of his findings and explained what he had found in laymen's language so that they would understand it. Mr. Carr testified that Dr. Nichols told him the electrocardiogram was slightly abnormal and that his white count was off. Mrs. Carr denied any knowledge of the heart condition but did admit that Dr. Nichols had told her of the high white count.

Medication was given for the heart condition and blood tests were made over the next several months. Dr. Nichols saw Mr. Carr on February 13, February 27, March 26, May 14, May 28 and June 25. The medication helped the heart condition. The white count stayed up. Since the cause of the latter condition had not been discovered, Dr. Nichols recommended a lymph node biopsy or bone marrow aspiration but Mr. Carr refused to have either done. He was not discharged by Dr. Nichols but an appointment was made for him when he was seen in June which he failed to keep. After seeing him over this period of five months Dr. Nichols' diagnosis was the same as it had been in February.

On April 8, 1961, defendant made application through Mr. Jett, an agent for plaintiff, for a Hospital Expense Policy.

The application contained the usual type of questions concerning abnormal physical conditions, known disease and medical examination, treatment and advice, and the pertinent questions and answers are referred to and set out in paragraphs 3 and 4 of the petition. The only disclosure made by defendant in answers to these questions was that he had been operated on for hemorrhoids in February, 1954, by Dr. Murphy at his office in Cardington. He did not reveal his attendance and treatment by Dr. Nichols which had extended over the period from February to June, 1960, that an electrocardiogram had been run and found to be abnormal and that a heart condition and an abnormal blood condition had been found. The application contains the representation over the signature of Mr. Carr set out in paragraph 4 of the petition that the statements and answers in the application are complete and true.

When the application was filled out, defendant said nothing about any of the conditions found by Dr. Nichols. He did, however, tell Mr. Jett that he had had a physical examination at a clinic, but did not say what clinic or when.

The application for the policy was processed and a policy, which has been admitted in evidence as Plaintiff's Exhibit C, was issued in April, 1961. The plaintiff would not have approved the application and issued the policy had defendant Carr revealed therein the nature of the examination by Dr. Nichols and the conditions found by him.

Later in 1961 Mrs. Carr filed a claim under the policy and, in the course of investigating it, plaintiff learned of the examinations, findings, diagnosis and treatment of Mr. Carr by Dr. Nichols. Plaintiff elected to rescind the policy on the ground of fraudulent misrepresentations by Mr. Carr in the application and tendered the amount of the premiums which had been received together with interest to the date of tender. A letter which was sent to Mr. Carr concerning the recission and tender after he had earlier been seen by a representative of plaintiff was admitted in evidence as Plaintiff's Exhibit D and the other facts in this regard were stipulated by the parties.

Consideration of a case such as this properly begins with general principles as to recission of a contract for fraud, proceeds to the particularized situation presented in insurance policies and then examines the Ohio statute that sets forth

388

the requirements for recission of a policy such as is here involved.

It is, of course, well-settled that a contract procured by fraud is voidable at the election of the defrauded party. (See 17 C. J. S., 929.) An insurance policy stands on the same basis as other contracts in this regard.

"Like all other contracts, a contract of insurance procured by fraud is voidable." 44 C. J. S., 1011.

There is, however, one important distinction to be noticed between the ordinary contract and the insurance policy. The law has recognized that the practicalities of the situation place insured and insurer in a much different position than are most contracting parties. The insurer, at least under a policy such as that here involved where there is no medical examination, must look to the insured for all of the information on which it is to consider the issuance of the policy. Insured, in turn, is entering into a somewhat particularized type of contract and may justifiably expect treatment such as that circumstance dictates. With the utmost correctness the United States Supreme Court has accordingly called attention to the fact that:

"Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option. (Citing authorities.)" *Stipoich* v. *Metropolitan Life Ins. Co.*, 277 U. S., 311 (1928).

The same Court in an earlier case, *Mutual Life Insurance Co.* v. *Hilton-Green*, 241 U. S., 613, 36 S. Ct., 676, 60 L. Ed., 1202, had announced the same principle as follows:

"Beyond doubt an applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties."

Other courts and legal authorities have declared the relation of insured and insurer to be *fiduciary* and to require of the parties the utmost good faith in their dealings.

"Whenever a contract is in its essential nature intrinsically fiduciary, the utmost good faith and the fullest disclosure of material facts are required from the parties, * * *. Any concealment of a material fact known to a party would necessarily be fraudulent. The most familiar and illustrative example of

such contracts is that of insurance." Pomeroy, Equity Jurisprudence, Vol. 2, Sec. 907.

The law requires the applicant for insurance to disclose fully, completely and truthfully all of the facts deemed material by the insurer, and if he violates the relation any policy issued is voidable at the election of the insurer.

The Ohio legislature has recognized that fraud in an insured's application avoids the contract and in Section 3923.14, Revised Code, has set forth the essential elements that must be shown by the insurer in such a case:

"The falsity of any statement in the application for any policy of sickness and accident insurance shall not bar the right to recovery thereunder, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such false statement is willfully false, that it was fraudulently made, that it materially affects either the acceptance of the risk or the hazard assumed by the insurer, that it induced the insurer to issue the policy, and that but for such false statement the policy would not have been issued."

This section has been construed by the Supreme Court in *Redden* v. *Constitution Life Ins. Co.*, 172 Ohio St., 20, 173 N. E. (2d), 365 (1961), affirming 113 Ohio App., 202, 166 N. E. (2d), 410. In the opinion in this case the court said:

". . . One of the elementary principles of insurance law is that nothing more completely vitiates an insurance contract than false answers to material questions in the application." and the syllabus of the case is as follows:

"Under the terms of a contract for health and accident insurance, a recovery is precluded by false answers knowingly given by the insured to material questions contained in his signed application or where the insured on delivery of the policy discovers that such answers are false and he then conceals such falsity from the insurer."

The significance of the syllabus is that it recognizes that, when an applicant makes a knowingly false answer to a question in the application, such answer satisfies the statutory requirement that it be "willfully false" and "fraudulently made."

Section 3923.14, Revised Code, is of relatively recent vintage, having been enacted in 1956. There has, however, been a comparable Ohio statute in connection with life insurance

for many years which is now Section 3911.06, Revised Code (formerly Section 9391, General Code), and which provides:

"No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer."

The only significant difference is that the final clause— "and that the agent or company had no knowledge of the falsity or fraud of such answer"—does not appear in Section 3923.14, Revised Code. Decisions under Section 3911.06, Revised Code, are obviously helpful in applying the newer statute and, accordingly, we shall refer to the most significant.

In *Sambles* v. *Metropolitan Life Ins. Co.*, 158 Ohio St., 233, 108 N. E. (2d), 321 (1952), the issue was the same as in the case at bar. Plaintiff, the beneficiary, contended that, even though the answers in question were "false," they were not "willfully false" and "fraudulently made." The Supreme Court held, however, in the first syllabus:

"Where an applicant for life insurance states in his application for such insurance that the present condition of his health is good and that he has neither consulted nor been treated by any physician within the past five years, although he has been treated by a physician for a serious ailment and knows that he has had a serious ailment, such statements are as a matter of law willfully false and fraudulently made within the meaning of Section 9391, General Code."

It will be noted that what the court here held was that where an answer is knowingly false it is as a matter of law "willfully false" and "fraudulently made" within the meaning of the statute.

The Supreme Court has reiterated this principle in the recent case of *Jenkins* v. *Metropolitan Life Ins. Co.*, 171 Ohio St., 557, 173 N. E. (2d), 122 (1961). After setting forth the four requirements of the statute, the court held in the third syllabus:

"Where in an application for a policy of life insurance an insured states that he was last sick about 10 months earlier and then treated by doctor M for a cold and such insured then gives a negative answer to a question as to whether he had consulted any physician within five years for reasons not mentioned in the application and where it appears that such insured had consulted doctor M at times 40, 32 and 12 days before giving that answer and where there is no evidence tending to prove that the insured made an honest mistake in giving such negative answer, such answer will be held as a matter of law to have been willfully false and fraudulently made."

When these two cases decided under the earlier statute and the *Redden case* decided under the statute that is applicable in the case at bar are applied to this case, it is clear that plaintiff is entitled to recission of the policy here involved. Mr. Carr, within less than a year before making application for this policy, had seen Dr. Nichols on eight occasions during which time an abnormal heart condition and a high white count had been found and Mr. Carr advised of the findings. He necessarily knew from what was told him, from the medication given and from the further procedures recommended as to the white count—a lymph node biopsy and bone marrow aspiration—that the conditions found were of significance and consequence. He could not, in the language of the *Jenkins case*, have made an "honest mistake" in failing to disclose these conditions in his application. The negative answers to the questions as to any known abnormal physical condition, as to any known bodily disease or disorder and as to any medical attention other than that by Dr. Murphy were all knowingly false and being such were, within the rule of all three of the above cases, willfully false and fraudulently made. As noted, there is no provision in this statute as to knowledge of the agent as there is in the statute applicable to life insurance, but even if such a requirement were involved, it is likewise undisputed that Mr. Carr did not tell Mr. Jett anything of his attendance by Dr. Nichols and of the conditions found which are referred to above. The requirements of Section 3923.14, Revised Code, have been abundantly met in this case and the relief prayed for in the petition is granted.

392

This decision shall constitute separate conclusions of law and separate conclusions of fact as provided by Section 2315.-22.1, Revised Code.

Exceptions for Defendant.